# In the United States Court of Federal Claims

No. 16-1409T

(Filed: August 16, 2019)

**************************************
\*
UNION TELECOM, LLC,                \*
\*
\*
                     Plaintiff,     \*    26 U.S.C. § 4521; Federal Excise Tax;
\*    Tax Refund; Prepaid Telephone Cards;
v.                          \*    Telecommunications Carrier; Transferee;
\*    Telecommunications Carrier Affiliate;
THE UNITED STATES,        \*    Alter Ego.
\*
                  Defendant.   \*
\*
**************************************

*Andrew P. Kawel*, with whom was *Edward A. Maldonado*, Law Offices of Edward A. Maldonado PA, Coral Gables, Florida, for Plaintiff.

*Benjamin C. King*, with whom was *Richard Zuckerman*, Principal Deputy Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, and *G. Robson Stewart*, Assistant Chief, Tax Division, Court of Federal Claims Section, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.[1]

    This case arises from a complex corporate structure designed to avoid the payment of Federal Excise Taxes ("FET") to the United States Government. Plaintiff Union Telecom, LLC ("Union Telecom") is seeking a refund of taxes allegedly paid on its purchase of prepaid long-distance telephone cards. A subsidiary of IDT Corporation ("IDT"), IDT Puerto Rico & Company ("IDT PR"), sold cards to Union Telecard Alliance, LLC ("UTA"), a separate, IDT majority-owned entity. UTA then resold these cards to its majority-owned subsidiary, Union Telecom. Union Telecom asserts that the price it paid

---

[1] Judge Wheeler received this case by transfer from the Chief Judge on January 23, 2019, after the previously assigned judge, Susan G. Braden, departed from the Court.

for these cards included a three-percent FET on toll (long distance) telecommunications services pursuant to 26 U.S.C. § 4251 of the Internal Revenue Code ("FET" or "the tax").[2] In 2006, the IRS entitled taxpayers to a refund for FET paid between approximately 2003 and 2006. Plaintiff avers that it paid $17,051,190 in FET during that period and claims that amount in tax refunds, plus $2,714,380 in interest.

Union Telecom is entitled to a refund if (1) it paid the FET; and (2) it was the first non-telecommunications carrier to purchase prepaid phone cards from a telecommunications carrier in the chain of these cards' distribution. The evidence presented at trial shows that Union Telecom did not pay any FET during the relevant period and that it was not the first non-telecommunications carrier to buy IDT's cards. The Court, therefore, DENIES Plaintiff's petition for a refund.

<u>Background</u>[3]

A. <u>Prepaid Telephone Cards</u>

Prepaid telephone cards allow purchasers to access a fixed amount of calling time on a telecommunications carrier's ("carrier") network by using a unique personal identification number ("PIN"). <u>See</u> Section 4251(d)(3); Treas. Reg. § 49.4251-4(b). After making a call, the number of minutes of remaining calling time on the card is reduced by each call's duration.

B. <u>The Federal Excise Tax on Prepaid Phone Cards</u>

1. <u>Table Services</u>

Section 4251 imposes a three-percent tax on "amounts paid for communications services . . . ." § 4251(a)(1); <u>see also</u> § 4251(b)(2). Taxable "communications services" include local telephone service, toll telephone service, and teletypewriter exchange service. <u>See</u> §§ 4251(b)(1), 4252. The taxpayer is "the person paying for such [communications] services." § 4251(a)(2).

2. <u>FET Collection</u>

Section 4251(d) explains the FET's collection process for telecommunications services acquired by prepaid phone card. The card's face value (the amount the consumer

---

[2]  The Internal Revenue Code is contained in volume 26 of the U.S. Code. Hereinafter, the Court will cite simply to the section number of the Internal Revenue Code.

[3] The Court will refer to the trial transcript by witness and page as "Name, Tr. __" and to trial exhibits as "PX __" for Plaintiff's exhibits, "DX __" for Defendant's exhibits, and "JX__" for joint exhibits.

is charged for the card) is the taxable amount.  § 4251(d)(1)(A).  That sum is considered paid, and subject to the tax, "when the card is transferred by a telecommunications carrier to any person who is not a carrier."  § 4251(d)(1)(B).  The taxpayer—the first non-carrier to purchase cards from a carrier—is called the "transferee."  <u>See</u> Treas. Reg. § 49.4251-4(b) (defining the FET taxpayer as the first non-telephone carrier that purchases prepaid phone cards from a telephone carrier).  Sales between carriers, or between non-carriers are, therefore, not FET-taxable events.  Lastly, the transferee taxpayer pays the FET indirectly.  The carrier selling the cards collects the tax from the transferee and then remits that sum to the Government.  § 4291; Treas. Reg. § 49.4251-4(d)(1).

The distinction between carriers and non-carriers is, therefore, essential to determining who pays this tax.  "Carrier", under this taxation scheme, "means a telecommunications carrier as defined in 47 U.S.C. § 153."  Treas. Reg. § 49.4251-4(b).  That section defines a "telecommunications carrier" as "any provider of telecommunications services" but not aggregators of such services.  § 153(51).[4]  Whether an entity offers telecommunications services drives the carrier-transferee distinction.  Those that offer telecommunications services are carriers; those that do not are transferees for purposes of the FET.

3.  <u>The IRS Reinterprets "Toll Telephone Service"</u>

Historically, the IRS maintained that prepaid phone cards offered toll telephone services.  "Toll telephone service" is a "telephonic quality communication for which (A) there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication and (B) the charge is paid within the United States."  § 4252(b)(1).  The IRS interpreted the "distance" and "time" variables in the disjunctive.  It therefore collected FET when a call's cost varied by either duration or distance.  The IRS subjected prepaid phone cards to FET as offering toll services because they billed customers by a call's elapsed time.

---

[4] "Telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  § 153(50).

"Telecommunications services" "means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  § 153(53).

A "carrier" is:

> [A]ny person engaged as a common carrier for hire, in interstate or foreign communication by wire, radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, in so far as such person is so engaged, be deemed a common carrier.

§ 153(11).

In 2006, the IRS departed from that interpretation.[5]  It recognized that to be subject to this tax, section 4252(b)(1) requires that providers vary charges by both call length and distance.  Accordingly, a call that is billed by only elapsed time but not distance fell outside of the definition of a toll taxable service.  See IRS Notice 2006-50, 2006-1 C.B. 1141 at 1, 6-7, https://www.irs.gov/pub/irs-drop/n-06-50.pdf (hereinafter Notice 2006-50).  Since prepaid phone cards charged customers for a call's time but not its distance, this notice put the cards outside the definition of an FET-taxable service.  The IRS also entitled the transferee to a credit or refund of FET paid on toll services "after February 28, 2003, and before August 1, 2006 (the relevant period)."  Id. at 6.

## C.  IDT's Corporate Structure

### 1.  IDT

Bringing a prepaid phone card to market typically involves a chain of different entities, each performing a distinct role.  Carriers own the infrastructure—the network phonelines themselves—used to make a call.  Service suppliers buy minutes of calling time on a carrier's network from the carrier which the supplier makes accessible through a PIN.  Suppliers also typically assign a "face value" to the card which represents the price that the customer will ultimately pay for the card.  Distributors purchase these PINs (at a discount from face value), print physical cards bearing the PIN and an access number, then market and resell these cards to retailers (at a lesser discount).  Retailers sell the cards to the public for face value.

IDT is a Federal Communications Commission ("FCC") licensed interstate and international telecommunications carrier that offered prepaid phone cards.  PX 1.  IDT created a similar series of subsidiaries and affiliates as outlined above to distribute and sell its cards.

### 2.  UTA

Carlos Gomez formed UTA to distribute prepaid phone cards from various suppliers to retailers in New York.  In 1998, IDT entered into a joint venture with UTA to gain access to its valuable distribution network.  PX 73; JX 7.  The joint venture (which continued to operate under the UTA brand) marketed and sold IDT's cards (in addition to other carriers' cards) to UTA's network of retailers.  PX 73; Farber, Tr. 487-89; Shah, Tr. 79.  IDT owned 51% of the joint venture and held the right to appoint its President, Chief Financial Officer,

---

[5] The IRS reconsidered its interpretation of section 4252(b)(1) after a number of courts disagreed with the IRS's understanding of this provision.  See, e.g., Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1338 (11th Cir. 2005) (service not taxable because carrier's charge did not vary in amount according to both the call's distance and duration).

and Chief Operating Officer. PX 73 at 1, 8-9, 19. Gomez held the remaining 49% and could appoint the Chief Executive Officer.[6] Id. However, Gomez came to direct UTA's policies and day-to-day operations, wielding considerably more power over the joint venture than the partnership agreement allocated to him. See Peterson, Tr. 212-13; Katz, Tr. 536-37. Lastly, UTA was not independently licensed as a carrier by the FCC and was not included under IDT's license.

### 3. Union Telecom

Prakash "Peter" Shah owned and operated a chain of convenience stores in New York. Shah, Tr. 76. In the 1990s, Shah began selling prepaid phone cards in his stores, some of which he purchased from Gomez. Katz, Tr. 533. Accordingly, Shah and Gomez had a longstanding business relationship when Gomez entered into the joint venture with IDT. Shortly after the UTA joint venture's formation, UTA and Shah created Union Telecom to distribute IDT's cards to Shah's network of stores. JX 8.[7] UTA owned 51% of Union Telecom, Shah owned 49%, and the two shared profits equally. Id.

### 4. IDT PR

In or around 2001 (when the IRS still interpreted prepaid phone cards as FET-taxable toll services), IDT created IDT PR during a reorganization aimed to avoid paying FET. A taxpayer is liable for FET on toll communications services when the service is paid for "within the United States." § 4252(b)(1); JX 5 at 6. IDT restructured its prepaid phone card business to put the taxable transaction outside of the United States and, therefore, outside of the definition of an FET-taxable service. JX 5; JX 7; Peterson, Tr. 269. IDT's wholly owned Dutch holding company, Strategic Dutch Holdings BV, established two wholly owned subsidiaries, IDT Netherlands BV and New Phone Dutch Holdings BV. JX 7; JX 6. These two new Dutch companies then formed a partnership, IDT PR.[8] JX 7; JX 6; Peterson, Tr. 267-69. IDT PR held itself out as a carrier. DX 4. IDT (a carrier) sold minutes of calling time to IDT PR (also a carrier). Peterson, Tr. 228, 291. IDT PR then separated the minutes into blocks accessible by PINs, JX 7; Peterson, Tr. 228, and sold these PINs to UTA (a non-carrier). JX 7. UTA would then deposit

---

[6] Gomez has since sold his interest in UTA to IDT, making IDT the sole owner of UTA.

[7] During closing argument, counsel for Union Telecom attempted to cast doubt on the validity of the shareholder agreement forming Union Telecom (a business which operated effectively for years). Closing Arg., Tr. 625. Union Telecom's argument is equal parts bizarre and untimely. Plaintiff raised no challenge to this agreement at any point prior to closing argument. In fact, both parties jointly submitted this document into evidence, and Shah affirmed that this document was his agreement with UTA. Shah, Tr. 157 (MR. KING: Go to Joint Exhibit 8. . . Q: And this is your agreement with UTA? A: That's correct.). Union Telecom's late attempt to undermine its own evidence underscores the absurdity of its assertion.

[8] IDT Netherlands BV owned 99% of IDT PR. New Phone Dutch Holdings BV owned 1%.

payment in IDT PR's Irish bank account.  DX 4; JX 6.  Under this scheme, the taxable event—the transfer of cards from IDT PR, the carrier, to UTA, the transferee—did not occur "within the United States."  The FET was inapplicable as a result.  JX 5; JX 13.

IDT asked its outside consultants, Deloitte & Touche LLP ("Deloitte"), to review this plan before implementation.  Id.  Deloitte agreed that the new structure would "more likely than not" allow IDT to avoid paying FET and that the IRS would likely not challenge IDT's new structure.  Id.  Since the reorganization, IDT told the IRS about this business structure and its existence to avoid paying FET at least twice.  See JX 13; DX 4.  The IRS raised no issue on either occasion.  Peterson, Tr. 325, 336.

D. Card Distribution

In or around 2001, IDT began using its new series of subsidiaries and affiliates to distribute its phone cards in the above-described manner.  When Union Telecom was ready to sell more cards, it would set the distribution process in motion.  Union Telecom would purchase cards with inactive PINs and access numbers from a printer for the cost of printing.  JX 8.  It would then place an activation request with UTA through the IDT-owned "Oasis" system, IDT's online card sales platform.  PX 27; Shah, Tr. 122-23; Peterson, Tr. 350.  After receiving an activation request from Union Telecom, UTA would request that IDT PR activate the PINs.  JX 6; PX 9; Shah, Tr. 162; Farber, Tr. 497-98.  Upon activation, IDT PR sold activated cards to UTA who then sold them to Union Telecom.  After activation, the Oasis system automatically generated an invoice for Union Telecom, payable to UTA, for the active PINs.  See, e.g., JX 9 at 2 (UTA invoice stating that "all products purchased from UTA are made expressly for resale in their present form to retail customers"); JX 8 at 1 (shareholder agreement between UTA and Union Telecom stating that Union Telecom was to "market and sell long distance calling cards acquired from Union [UTA]"); Shah, Tr. 162.  Union Telecom would deposit payment directly into UTA's account.  Shah, Tr. 162; Farber, Tr. 456-57.  Union Telecom then sold the cards in its network of stores.

E. Union Telecom Files for a Tax Refund With the IRS

Union Telecom maintains that (1) UTA included the FET in the price that it charged Union Telecom for IDT's cards and (2) that it was the transferee of these cards.  First Am. Compl. ¶ 34, 49.  In February 2010, Shah filed a claim for an FET refund on Union Telecom's behalf, which the IRS ultimately and fully denied in March 2015.  JX 4.[9] Plaintiff filed a complaint in this Court on October 27, 2016 (amended on March 1, 2017) claiming a $17,051,190 refund, plus $2,714,380 in interest.  The Court, with Judge Braden

---

[9] When Shah filed this first tax refund claim, he was Union Telecom's minority owner.  As minority owner, Shah did not have the authority to file this claim.  UTA ultimately transferred its ownership interest in Union Telecom to Shah, providing him with the requisite authority to file that claim.

presiding, held a three-day trial on November 2, November 5, and November 6, 2018.  On January 23, 2019, Chief Judge Margaret M. Sweeney transferred this case to Judge Thomas C. Wheeler.  Dkt. Nos. 49-50.  Post-trial briefing concluded on July 9, 2019, and the Court heard closing argument on July 31, 2019.

Discussion

A. IDT Did Not Include FET in the Price it Charged for its Cards.

The IRS allows only those who paid the FET to claim a refund.  Notice 2006-50 at 6 ("[T]axpayers may request a refund of tax paid under § 4251 on nontaxable services that was billed to the taxpayers.").  The IRS's directive comports with the well-settled principle that "a taxpayer is not entitled to a refund unless he has in fact overpaid the particular tax . . . ."  Dysart v. United States, 169 Ct. Cl. 276, 281 (1965); see also Lewis v. Reynolds, 284 U.S. 281, 283 (1932) ("the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax").  This standard extends to excise tax refunds.  See Epstein v. United States, 174 Ct. Cl. 1158, 1174 (1966); United Prepaid Network, Inc. v. United States, 112 Fed. Cl. 59, 62 (2013).  However, when a card purchaser pays a bill for prepaid phone cards, courts have determined that there is a rebuttable presumption that the carrier included FET in the card's price paid by the transferee.  Id. at 63.

1. Union Telecom Did Not Pay the FET

UTA's invoices to Union Telecom did not show an FET line item.  See, e.g., JX 9.  Each invoice only included a general line item for "Taxes", with each showing a "Taxes" charge of $0.00.  JX 9 at 2.  This item likely reflected sales tax, and not the FET.  See Shah, Tr. 162-63; Peterson, Tr. 356-57; Farber, Tr. 479.  Since the invoices are not instructive, the Court must look to the surrounding circumstances to understand whether IDT included FET in its cards' price.[10]  The answer is a resounding "no".

The sole purpose behind IDT's corporate reorganization was to avoid paying FET.  Peterson, Tr. 271.  IDT then engaged Deloitte to confirm whether the proposed reorganization would likely have this desired effect.  Deloitte's report opined that after the restructuring, IDT's prepaid phone card sales did "not fall within the definition of taxable communications services . . . ."  JX 5.  Deloitte concluded that "it is 'more likely than not' that such services are not subject to the three-percent FET."  Id.; see also Peterson, Tr. 214-15.  The IRS audited IDT's FET return for the first two quarters of 2004.  JX 13.  During

---

[10] Union Telecom spends much time attempting to show that IDT imperfectly implemented its FET-avoidance scheme.  However, that is not particularly relevant.  What matters is whether IDT believed it effectuated its FET-avoidance scheme.  Even if IDT imperfectly executed its scheme so that the cards were subject to FET, the evidence still shows that IDT relied on the structure it put in place and included no FET in its cards' price as a result.

that audit, IDT told the IRS that its card sales were not FET-taxable services, and that it did not pay the tax as a result. JX 13; Peterson, Tr. 324-25. The IRS accepted that assessment. JX 13; Peterson, Tr. 325. In 2006, the IRS then audited IDT's income tax returns for 2001-2004 as they related to IDT PR. DX 4. IDT told the IRS that IDT PR's business purpose was to avoid paying the FET, and the IRS raised no issue with that purpose. DX 4 at 16; Peterson, Tr. 336.

With this corporate structure in place, IDT, IDT PR, UTA, and Union Telecom neither collected nor paid any FET during the relevant period. IDT's tax documents show no FET remittance to the Government. JX 13; Peterson, Tr. 226-27. Moreover, UTA purchased cards from IDT PR knowing that this entity existed, and that payments were structured, to avoid the FET. Peterson, Tr. 354. UTA, therefore, never paid any FET nor included FET in the price that it charged Union Telecom. Farber, Tr. 476, 504-05. Separate documents and testimony further confirm that Union Telecom paid no FET.

IDT has consistently maintained that it never remitted any FET to the Government nor collected FET from any of its affiliates during the relevant period. For that reason, after learning that Union Telecom was pursuing a FET refund, IDT sent a letter to Union Telecom explaining that no refund was possible. See DX 1. IDT explained:

> 1. IDT did not pay any federal excise taxes on the telecommunications services underlying the prepaid calling cards that Union CT Telecom purchased from IDT;[11] and
> 2. IDT did not charge Union CT Telecom any federal excise on the telecommunications service underlying the prepaid calling cards that Union CT Telecom purchased from IDT.
> As a result, Union CT Telecom is not entitled to a federal excise tax refund for the prepaid calling cards it purchased from IDT. Any application or request for the refund made by Union CT Telecom would be fraudulent.

Id. (emphasis in original).[12] Joseph Farber's (UTA's former CFO) and John Peterson's (IDT's Vice President of Tax) trial testimony reiterates IDT's position in this letter. Farber,

---

[11] Union Telecom also did business under the name Union CT Telecom after Shah became that entity's sole owner.

[12] Shah insists that during settlement negotiations involving a separate dispute between Shah and IDT regarding Union Telecom's ownership, IDT executives claimed a right to any FET refund that Union Telecom might receive. Shah, Tr. 166-67. Union Telecom interprets this statement as an admission by IDT that it collected FET from Union Telecom. However, the Court can give this alleged statement little weight. While the Court has no reason to doubt Shah's recollection, this purported statement is not especially probative. The Court has heard no testimony from other individuals that were a party to that negotiation, cannot assume to know why IDT made this statement, and has before it a substantial amount of evidence showing that FET was not collected.

Tr. 472, 473-74, 505; Peterson, Tr. 225, 271, 316.  Farber and Peterson both had first-hand knowledge of the factors that went into setting the price for IDT's phone cards and confirmed that FET was not included.  Peterson, Tr. 354; Farber, Tr. 504-05.

Plaintiff theorizes that IDT's non-remittal of FET to the Government does not reinforce that IDT did not collect FET from the transferee.  Rather, Union Telecom alleges foul play: IDT collected FET from Union Telecom as it was obligated to do under § 4291, but fraudulently refused to remit that amount to the Government.  To believe these severe accusations, the Court must ignore UTA and IDT employees' statements, Deloitte's assessment, and the IRS's two no-action determinations.  But Union Telecom's attempt to rebut or discredit these sources is left seriously wanting.

Union Telecom points to two sources for support.  First, it submits invoices that Union Telecom paid to UTA for the cards as proof that it paid the tax.  See PX 24.  However, these invoices simply show that Plaintiff paid for the product, they make no mention of FET.  Second, it credits Shah's naked assertions that the price Union Telecom paid for IDT's cards included the FET as evidence of FET payment.  See Shah, Tr. 161.  Shah's assessment is based on nothing more than speculation.  He played no part in setting the rates for IDT's cards and had no personal knowledge of whether the cards' price included FET.  Shah, Tr. 166.  Instead, he believes that IDT included FET because (1) it was the industry practice not to itemize each tax but to include all taxes (including FET) in the total price, and (2) he claims that IDT's business operations were underhanded, and its collection but non-remittal of FET is consistent with these purported fraudulent practices.  Shah, Tr. 133, 163-64.  Given the lack of corroboration, support, or first-hand knowledge, Shah's assessment is not probative.[13]  In short, Union Telecom ignores the reality of the situation here—IDT structured its business to avoid paying the FET.  Its cards' price included no FET as a result.

Plaintiff offers no other relevant evidence to demonstrate that IDT included FET in the cards' rate.  Union Telecom's case, therefore, rests on conjecture and the rebuttable presumption that IDT included FET in the card's price.  Plaintiff certainly purchased the cards from UTA, see PX 24, but the Government's swath of uncontroverted evidence shows that IDT never included FET in those cards' price during the relevant period.  The Government's showing is more than enough to overcome this presumption.

Lastly, IDT's inclusion of FET in the cards' price would be illogical.  IDT engaged in a lengthy and complex process of international corporate restructuring to avoid the FET, lower its costs, and offer a more competitively priced prepaid phone card.  Billek, Tr. 436-

---

[13] At trial, Judge Braden commented that Shah was a "credible witness."  Shah, Tr. 181.  Plaintiff reads that statement as a blanket ratification of Shah's authority and credibility on all matters.  Read in context, Judge Braden made this statement as part of her assessment that she did not believe that Shah brought this case in bad faith.   Context also shows that Judge Braden was probing into whether Shah appreciated the serious shortcomings in Union Telecom's case.  Shah, Tr. 181-84, 185-86.

37.  It would be irrational for UTA or IDT to then add the FET—the exact tax IDT sought to avoid—back into its product's price thus increasing its price for consumers.  Doing so would undo IDT's elaborate effort to avoid the FET and nullify any competitive advantage gained by this restructuring.

The evidence presented at trial confirms that IDT did not include FET in the price it charged Union Telecom for its prepaid phone cards during the relevant period.  Union Telecom, therefore, never paid the FET during these years, and is not entitled to a refund as a result.

### 2.  Union Telecom's Other Arguments are Unconvincing.

#### a.  IDT's State Tariffs Do Not Apply to the Cards at Issue.

States generally require telecommunications carriers to file tariffs which outline the carrier's rates and terms of service for any services offered in that state.  Billek, Tr. 421.  Union Telecom argues that certain IDT sister companies which also offered telecommunications services by prepaid phone card filed tariffs which admit that IDT included FET in its prepaid phone card rates.  PX 38, 44, 53, 57.  Plaintiff points to a passage in these documents which reads: "All federal, state and local taxes, assessments, surcharges or fees, including sales taxes, use taxes, gross receipts taxes and municipal taxes are included in a 20 percent tax which shall be deducted from prepaid phone card for services provided."  E.g., PX 38 at 42.   Union Telecom reads this passage literally.  Its position is that IDT stated that the rates it charged for its cards included "[a]ll federal . . . taxes" and since the FET is a federal tax, then IDT represented in its tariffs that its prepaid phone card rates included the FET.  Billek, Tr. 429.  Plaintiff's reliance on these tariffs is misplaced for two reasons.

First, these tariffs do not apply to the cards at issue.  States regulate intrastate telecommunications services, but the FCC has exclusive regulatory powers over interstate and international services.  See 47 U.S.C. §§ 151-52; In the Matter of Time Machine, Inc., 11 FCC Rcd. 1186 (1995) (describing the separate state and federal systems of telecommunications regulations).  IDT designed and marketed the disputed long-distance prepaid phone cards for interstate and international telecommunications services.  PX 2.  Accordingly, IDT's cards at issue likely provided interstate or international telecommunications services, functions squarely outside of a state's control.  Billek, Tr. 435.  The tariffs Union Telecom points to apply to a separate product IDT offered, its intrastate prepaid phone cards (that is, cards used for calls that originate and terminate within a single state or territory).  Billek, Tr. 435; PX 44 at 11 (limiting the tariff to "telecommunications within the State of Connecticut"); PX 48 (applying to services in Florida only); PX 53 (applying to services in Puerto Rico only).  As state-specific tariffs, they do not, and indeed cannot, apply to interstate or international telecommunications services.  These disclosures, therefore, apply to IDT's in-state only services, and not its

interstate or international services.  Union Telecom offers no evidence that customers used the cards at issue for purely intrastate calling.[14]

Second, Union Telecom reads these disclosures too broadly.  If "[a]ll federal . . . taxes" truly does mean "all", then Union Telecom must also believe that IDT represented that its cards included taxes that are inapplicable to its product, industry, corporate structure, and so on.  This cannot be so.  Instead, one must read a reasonable limitation into IDT's representation: its prices include all *applicable* federal taxes.  See Billek, Tr. 429. Even if the tariffs applied to these cards, the FET was not an applicable tax, and therefore not covered by this representation.

> b.  IDT Was Under No Duty to Disclose That It Was Not Paying FET.

Union Telecom argues for the first time in its post-trial reply brief that 47 U.S.C. § 201(b) requires IDT and its affiliates to disclose FET non-payment in "all advertisements, invoices, and the prepaid telephone cards themselves."  Pl. Reply at 8.  This section prohibits carriers from engaging in "unjust or unreasonable" practices, see § 201(b), including behaviors that would "be misleading to customers," see In the Matter of STi Telecom, Inc., 30 FCC Rcd. 11742 (2015).  Union Telecom argues in circular that section 201(b) obligated IDT to make FET non-payment disclosures because failure to make this disclosure would be misleading.  Pl. Reply at 8.  Because IDT made no such disclosure, Union Telecom submits that the Court must conclude that the cards' price included FET. Id.

Common sense requires a different conclusion.  Since IDT's cards were not subject to FET, that tax had no bearing on IDT's product's price.  Failing to include a disclosure regarding an irrelevant tax does not mislead consumers.  Indeed, its absence from any such disclosures would reinforce that the tax was not paid.  If the tax applied, one would expect it to impact IDT's cards' price and trigger IDT's obligation to make a disclosure. Moreover, requiring providers to include the entire universe of items that are both considered and not considered in setting rates, as Union Telecom appears to suggest, would be impractical and unnecessary.

> B.  UTA, not Union Telecom, Was the Transferee.

In the alternative, Union Telecom has no standing to claim an FET refund.  Only the transferee—the first non-carrier to purchase cards from a carrier—is entitled to a refund.  See Notice 2006-50 at 6.  UTA, not Union Telecom, was the transferee of IDT's

---

[14] Union Telecom also contends that because the cards at issue could theoretically be used for both interstate and intrastate communications, then these tariff declarations apply here.  Pl. Reply at 9.  This position does not recognize the dual state-FCC regulatory landscape.  The tariffs apply to purely in-state calls, and since Plaintiff provides no evidence that consumers used the long-distance cards for intrastate calls, then there is no basis for the Court to apply the tariffs to the situation at hand.

prepaid phone cards.  Union Telecom disagrees for four reasons: (1) IDT never transferred its cards to UTA; (2) UTA was itself a carrier; (3) UTA's affiliation with IDT caused it to become a carrier; and (4) the lack of corporate separateness between UTA and IDT imputed IDT's carrier status onto UTA.  The Court finds none of Union Telecom's arguments compelling.

### 1.  IDT "Transferred" its Cards to UTA.

Prepaid card sales are taxed "when the card is transferred by a telecommunications carrier to any person who is not a carrier."  § 4251(d)(1)(B).  Union Telecom argues that implicit in the transfer requirement is that activated cards physically move from the carrier to the transferee, and UTA never performed this step.  Pl. Reply at 4-5.

Union Telecom printed cards bearing inactive PINs and other information necessary to place a call on a physical card.  When Union Telecom was ready to sell these cards to customers, it would send an activation request to UTA via the Oasis system.  UTA would transmit the request to IDT PR who would then activate the PINs.  IDT PR then sold activated PINs to UTA, and UTA resold them to Union Telecom.  Union Telecom then held the activated cards ready for resale.  Union Telecom claims that UTA cannot be a transferee because UTA never possessed the physical card with an activated PIN.  However, Plaintiff's position ignores the essential transaction here.

Prepaid telephone cards allow purchasers to access a fixed amount of calling time on a carrier's network via a PIN.  See § 4251(d)(3); Treas. Reg. § 49.4251-4(b).  Since the PIN allows the customer to access the telecommunications services, the exchange of active PINs is the essential transfer of telecommunications services.  The card itself is only incidental.  After Union Telecom sent an activation request to UTA, IDT PR sold active PINs to UTA and then UTA resold those PINs to Union Telecom.  Before activation, Plaintiff only possessed a piece of paper.  Without an activated PIN, the cards did not offer telecommunications services; they could not be used to place a call.  As a result, when UTA sold active PINs to Union Telecom, it transferred to Union Telecom the ability to access calling time on IDT's network and satisfied the transfer requirement.

### 2.  UTA is Not a Carrier.

There are two types of prepaid phone card providers: those that market and sell another company's cards and those that market, sell, and perform additional services like assigning PINs, setting the card's number of minutes of calling time or pricing the card. See Telecommunications Reporting Worksheet, FCC Form 499-A: Instructions to the Telecommunications Reporting Worksheet at 35-36 (2009).  The latter group are telecommunications carriers and are required to make all requisite filings with the FCC and pay any relevant fees and charges.  The former group are not carriers and are not subject to these requirements.  See id. at 35 ("Companies who simply sell cards created by others

are marketing agents and do not file."); United States v. Unipoint Techs., Inc., 159 F. Supp. 3d 262, 270 (D. Mass. 2016) (card reseller was a carrier because it operated a website which allowed consumers to refill minutes onto their card in addition to selling PINs and access codes).

IDT set the rates for the cards.  DX 4; Farber, Tr. 470-72, 488; Shah, Tr. 100-01, 102-03.  UTA purchased PINs from IDT PR, requested that IDT PR activate those PINs (after receiving an order from Union Telecom), and invoiced Union Telecom.  Farber, Tr. 497-98.  UTA also helped market the cards, coming up with branding ideas like the cards' name and design.  Farber, Tr. 479-80.  UTA was, therefore, a marketing agent which the FCC determined is not a carrier.  Accordingly, UTA was not a carrier through its business of selling and marketing IDT's prepaid phone cards.

### 3.   UTA's Status as a "Carrier Affiliate" is Not Material.

United Telecom contends that UTA's affiliation with IDT, a telecommunications carrier, caused UTA to become a carrier itself.  According to Union Telecom, that makes it the transferee of IDT's cards.  Plaintiff's position misconstrues the effect of affiliation.

A telecommunications carrier "affiliate" is "a person that (directly or indirectly) owns or controls, or is owned or controlled by, or is under common ownership or control with, another person."  § 153(2).  Affiliation, therefore, can come about in two ways: through ownership or through control.  Ownership "means to own an equity interest (or the equivalent thereof) of more than 10 percent."  Id.  This section does not define control. Accordingly, the Court must look elsewhere to understand the term's operation.

Control is defined in a separate section under Title 47 (the title covering telecommunications) of the Code of Federal Regulations: 47 CFR § 63.09.[15]  That section defines control to "include[] actual working control in whatever manner exercised and is not limited to majority stock ownership.  Control also includes direct or indirect control, such as through intervening subsidiaries."  47 CFR § 63.09(b).  In sum, an entity is affiliated with those entities that it holds a 10% interest in and those over which it exercises "actual working control."

UTA is an IDT affiliate based on IDT's ownership but not based on its control.  IDT owned 51% of UTA, above the requisite 10% ownership interest triggering affiliation.  IDT could also appoint UTA's President, CFO, and COO—most of the company's senior leadership.  PX 73 at 1, 8-9, 19.  IDT's majority ownership and power of appointment gave it the potential to control UTA.  But the question is not whether IDT could control UTA;

---

[15] This regulatory framework relates to applications by carriers to provide international telecommunications services.  That section contemplates affiliation with a foreign carrier via either control or stock ownership. The overlap with the definition of affiliation applicable to these circumstances makes borrowing that section's definition of control reasonable.

rather, the statute directs the Court to consider whether IDT exercised that control in practice. IDT exerted no such control.[16]   However, UTA's affiliation with IDT is unremarkable because affiliation has no impact on UTA's status as a carrier or transferee.

The statute makes clear that affiliation defines the relationship between two entities; it is not a mechanism to transform a carrier's affiliate into a carrier.   Indeed, telecommunications carriers can (and do) have both FCC-regulated carrier affiliates and unregulated non-carrier affiliates. Southwestern Bell Corp. v. FCC, 896 F.2d 1378, 1381 (D.C. Cir. 1990) (FCC did not consider AT&T-affiliate Western Electric a carrier despite ownership by AT&T, a carrier).   A robust set of rules and regulations guides a carrier's interactions with its regulated (carrier) and unregulated (non-carrier) affiliates.   See 47 C.F.R. § 32.27 (regulating carriers' transactions with affiliates involving asset transfers). There would be no reason to distinguish between these two types of affiliates, and these rules would be replete with redundancy, if every carrier affiliate was itself a carrier.

Mere affiliation with a carrier, therefore, does not impute carrier status to an affiliate.   Instead, whether an entity is a carrier turns on whether it offers telecommunications services.   See, e.g., Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 533 F.2d 601, 608 (D.C. Cir. 1976) (carriers are such by virtue of "the actual activities [it] carries on."); Verizon California, Inc. v. FCC, 555 F.3d 270, 275-76 (D.C. Cir. 2009) (carrier affiliates were themselves carriers because they held themselves out to be carriers through their business practices).   According to this standard, a carrier affiliate is also a carrier only if the affiliate too provides telecommunications services.   As explained above, since UTA did not offer telecommunications services, it was not a carrier.

### 4.  IDT and UTA Maintained Corporate Separateness

Union Telecom argues that UTA and IDT did not operate as two separate companies.   Rather, according to Union Telecom, UTA functioned as IDT's alter ego. Plaintiff argues that this lack of corporate separateness caused UTA to adopt IDT's carrier status making Union Telecom the transferee.   The Court disagrees.

"[R]espect for corporate distinctions" is a "bedrock principle" of corporate law that is "deeply ingrained in our economic and legal systems."   United States v. Bestfoods, 524 U.S. 51, 62 (1998).   Corporate separateness is overlooked only when a parent-subsidiary relationship is such that the parent exercises "control, not mere majority or complete stock control, but complete domination, not only of the finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own."   Taurus IP LLC v. Orion IP LLC, 726 F.3d 1306 (Fed. Cir. 2013).

---

[16] As described below in this opinion, Carlos Gomez controlled UTA.

IDT owned 51% of UTA and could appoint UTA's President, CFO, and COO—most of the company's senior leadership. PX 73 at 1, 8-9, 19. Carlos Gomez held the remaining 49% and could appoint the CEO. This structure may have given IDT the ability to control UTA, but it did not exercise the "complete domination" necessary to find that UTA functioned as IDT's alter ego. Indeed, IDT did not even exercise the simple control over UTA allotted to IDT in the partnership agreement.

Despite Gomez's minority ownership share and ability to appoint a minority of UTA's leadership, he controlled UTA. Gomez "managed the day-to-day operations" at UTA. Peterson, Tr. 212, 320. He made all final decisions, excluded IDT-appointed leadership from meetings, and routinely frustrated IDT's appointed executives' ability to manage the business. Peterson, Tr. 212-13; Katz, Tr. 536-37, 538-40. Gomez's interference rendered IDT's appointees so ineffective that they would regularly quit, sometimes within mere months of beginning employment. Katz, Tr. 537-39. This dynamic lead to a high turnover rate among IDT-appointed executives at UTA. Katz, Tr. 537. Gomez also stonewalled IDT's attempts to enact changes at UTA. For example, Gomez refused to sell additional IDT products to UTA's network of retailers despite IDT's urging. Katz, Tr. 539. Gomez's close relationships with clients who preferred to do business with him exclusively coupled with UTA's profitability allowed him to impose his will on UTA in this way. Katz, Tr. 539-40, 554. IDT, therefore, hardly exerted "complete domination" over UTA.[17]

Rather, UTA existed as a separate entity to market and sell IDT's as well as other carriers' prepaid phone cards to its network of retailers (which included resellers apart from Union Telecom). Farber, 487-88. Moreover, UTA had autonomy over its distribution business and remained distinct from IDT. IDT filed its own, separate tax returns, had its own accountant, maintained its own books and records, handled its own accounts payable and receivable, occupied separate offices, maintained its own bank accounts, and prepared its own financial statements. See Farber, Tr. 500-01. The "complete domination" by IDT over UTA necessary to find that UTA operated as IDT's alter ego is noticeably absent, and the Court cannot disregard UTA's separate corporate identity as a result. UTA was therefore the transferee and the only entity able to claim an FET refund. See § 4251; Notice 2006-50.

## Conclusion

Plaintiff Union Telecom LLC paid no FET during the relevant period. In the alternative, should Plaintiff have paid this tax, it was not the transferee and is without standing to claim a refund. Accordingly, the Court DENIES Union Telecom's request for

---

[17] Some of UTA's employees reported to IDT officers. Farber, Tr. 487. This reporting structure, without more, fails to show a "complete domination" by IDT over UTA.

a refund.  The Clerk is directed to enter final judgment in favor of the Government.  In accordance with COFC Rule 54(d), the Court awards reasonable costs to Defendant.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge